☑ Original       ❏ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>The Cellular Telephone Assigned<br>Call Number(708) 986-7822 ("TT-1") | )<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. 24-829M(NJ)

Matter No. 2023R00322

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____ *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1. This court has authority to issue this warrant under 18 U.S.C. §§ 2703(c)(1)(A) and 2711(3)(A) and Federal Rule of Criminal Procedure 41.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before 3/29/2024 _____ *(not to exceed 14 days)*
❏ in the daytime 6:00 a.m. to 10:00 p.m.    ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Hon. Nancy Joseph _____ .
*(United States Magistrate Judge)*

☑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❏ for _____ days *(not to exceed 30)*  ☑ until, the facts justifying, the later specific date of _____ 09/11/2024 _____ .

Date and time issued: 3/15/2024 @ 12:26 p.m. _____

_____ *Judge's signature*

City and state:   Milwaukee, WI _____

Honorable Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| **Certification** |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

# ATTACHMENT A-1

## Property to Be Searched

1.     Records and information associated with the cellular devices assigned the call number (708) 986-7822 (referred to in the Affidavit as "Target Telephone-1 or TT-1" and in Attachment B as the Target Cell Phone), that is in the custody or control of AT&T (referred to herein and in Attachment B as the "Service Provider"), a wireless communications service provider that is headquartered at 11760 U.S. Highway 1, North Palm Beach, Florida.

2.     The Target Cell Phone.

1

# ATTACHMENT B

## Particular Things to be Seized

## I.      Information to be Disclosed by the Provider

To the extent that the information described in Attachment A-1 and/or A-2 is within the possession, custody, or control of the Service Provider, including any information that has been deleted but is still available to the Service Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Service Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A-1 and/or A-2:

   a.   The following subscriber and historical information about the customers or subscribers associated with the Target Cell Phone for the time period October 1, 2023, to the present:

   i.   Names (including subscriber names, usernames, and screen names);

   ii.   Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

   iii.   Local and long-distance telephone connection records;

   iv.   Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

   v.   Length of service (including start date) and types of service utilized;

   vi.   Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

1

vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records, and

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Target Cell Phone for the time period February 1, 2023, to the present including:

    a. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

    b. information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received), as well as timing advance or engineering data commonly referred to as per call measurement data (PCMD, RTT, True Call, Advance Timing, Network Event Location Operating System Information (NELOS), WebMap, or equivalent).

b. Information associated with each communication to and from the Target Cell Phone for a period of 30 days from the date of this warrant, including:

    i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

    ii. Source and destination telephone numbers;

    iii. Date, time, and duration of communication; and

    iv. All data about the cell towers (i.e., antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the Target Cell Phone will connect at the beginning and end of each communication, as well as timing advance or engineering data commonly referred to as per call measurement data (PCMD, RTT, True Call, Advance Timing, Network Event Location Operating System Information (NELOS), WebMap, or equivalent).

2

c. Information about the location of the Target Cell Phone for a period of 30 days during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

   i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Service Provider, the Service Provider is required to disclose the Location Information to the government. In addition, the Service Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of the Target Cell Phone on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

   ii. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. See 18 U.S.C. § 3103a(b)(2).

## II.     Information to be Seized by the Government

All information described above in Section I that constitutes evidence of violations of Title 21, United States Code, Sections 841(a)(1) and 846, involving Hammad ISA and Foad ISA and others known and unknown from October 1, 2023, to the present.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider to locate the things particularly described in this Warrant.

3

# UNITED STATES DISTRICT COURT
### for the
Eastern District of Wisconsin

| | | |
|---|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>**The Cellular Telephone Assigned<br>Call Number (708) 986-7822 ("TT-1")** | )<br>)<br>)<br>)<br>)<br>)<br>) | Case No.24-829M(NJ)<br><br>Matter No. 2023R00322 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1. This court has authority to issue this warrant under 18 U.S.C. §§ 2703(c)(1)(A) and 2711(3)(A) and Federal Rule of Criminal Procedure 41.

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1) & 846 | Distribution of and possession with intent to distribute controlled substances; Conspiracy to distribute and to possess with intent to distribute controlled substances. |

The application is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

☑ Delayed notice of __180__ days *(give exact ending date if more than 30 days:* __09/11/2024__ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

SEAN MAYERBOCK (Affiliate) Digitally signed by SEAN MAYERBOCK (Affiliate)
Date: 2024.03.14 15:49:56 -05'00'

*Applicant's signature*

Sean Mayerbock, DEA TFO

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____telephone_____ *(specify reliable electronic means)*.

Date: _____
3/15/2024

*Judge's signature*

City and state:  Milwaukee, WI

Honorable Nancy Joseph, U.S. Magistrate Judge

*Printed name and title*

# AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Sean Mayerbock, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number **(708) 986-7822** (**Target Telephone-1** or **TT-1**), known to be used by Hammad ISA and telephone assigned call number **(312) 375-5886 (Target Telephone 2 or TT-2)**, known to be used by Foad ISA. **TT-1** service provider is AT&T Corporation, a wireless telephone service provider ("Service Provider") headquartered at 11760 U.S. Highway 1, North Palm Beach, Florida. **TT-2** service provider is T-Mobile US, Inc., a wireless telephone service provider ("Service Provider") headquartered at 4 Sylvan Way, Parsippany, New Jersey. **TT-1** and **TT-2** are described herein and in Attachments A-1 and A-2, and the location information to be seized is described herein and in Attachment B.

2. Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to also comply with the Pen Register Act. *See* 18 U.S.C. §§ 3121-3127. The requested warrant therefore includes all the information required to be included in an order pursuant to that statute. *See* 18 U.S.C. § 3123(b)(1).

1

3. I am a Detective with the City of Brookfield Police Department and have been a sworn law enforcement officer for over 8 years. I am currently assigned to the North Central High Intensity Drug Trafficking Area (HIDTA) – Drug Gang Task Force. HIDTA is composed of law enforcement officers from the Milwaukee Police Department (MPD), Drug Enforcement Administration (DEA), Federal Bureau of Investigation (FBI), and several other federal and local law enforcement agencies. Since November 2019, I have been a Task Force Officer with the United States Department of Justice, Drug Enforcement Administration. As such, I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations of and to make arrests for federal felony offenses. As a federal law enforcement officer, I have participated in the investigation of narcotics-related offenses, resulting in the prosecution and conviction of numerous individuals and the seizure of illegal drugs, weapons, stolen property, millions of dollars in United States currency, and other evidence of criminal activity.

4. As a narcotics investigator, I have interviewed many individuals involved in drug trafficking and have obtained information from them regarding acquisition, sale, importation, manufacture, and distribution of controlled substances. Through my training and experience, I am familiar with the actions, habits, traits, methods, and terminology used by the traffickers and abusers of controlled substances. I have participated in all aspects of drug investigations, including physical surveillance, execution of search warrants, undercover transactions, court-ordered wiretaps, analysis of phone and financial records, and arrests of numerous drug traffickers. I have been the affiant on many search warrants. I have also spoken on numerous occasions with other

2

experienced narcotics investigators concerning the methods and practices of drug traffickers and money launderers. Furthermore, I have attended training courses that specialized in the investigation of narcotics trafficking. Through these investigations, my training and experience, and conversations with other law enforcement personnel, I have become familiar with the methods used by drug traffickers to manufacture, smuggle, safeguard, distribute narcotics, and to collect and launder trafficking-derived proceeds. I am further aware of the methods employed by major narcotics organizations to thwart any investigation of their illegal activities.

5.     This affidavit is based upon my personal knowledge, training, experience, and upon information reported to me by other federal, state, and local law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6.     Throughout this affidavit, reference will be made to case agents.  Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation.

7.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 841(a)(1) (distribution and possession with intent to distribute controlled substances) and 846 (conspiracy to distribute and to possess with intent to distribute controlled substances) have been committed, are being committed, and/or will be committed by Hammad ISA and Foad ISA. There is also probable cause to believe that

3

the location information described in Attachment B will constitute evidence of these criminal violations and will lead to the identification of other individuals who are engaged in the commission of these offenses.

8. The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

9. In August 2023, North Central HIDTA initiated a drug investigation involving the trafficking of cocaine and fentanyl from the area of Bellwood, Illinois to Milwaukee, Wisconsin via vehicle transportation.

10. The investigation to date has included traditional law enforcement methods, including but not limited to: interviews with a confidential source/source of information; information from other law enforcement officers; documentary evidence; telephone toll data; physical and electronic surveillance.

### Confidential Source Information

11. In August 2023, a confidential source, hereinafter referred to as CS-1, identified Kenneth ROBY as a multi-kilogram level cocaine trafficker. CS-1 informed case agents that CS-1 has personally purchased large amounts of cocaine from ROBY. CS-1 stated that ROBY resides with his wife in the area of N. 51st Boulevard and W. Congress Street in Milwaukee, Wisconsin. Case agents later identified that ROBY resides at 4338 N. 51st Boulevard, Milwaukee, Wisconsin, which is the same area as N. 51st Boulevard and W. Congress Street as referenced by CS-1. CS-1 stated the most narcotics

4

that CS-1 has personally observed ROBY to be in possession of was three kilograms of cocaine. CS-1 stated CS-1 saw this at ROBY's residence (4338 N. 51st Boulevard). CS-1 estimated that ROBY is selling 10-15 kilograms a month based on conversations CS-1 has personally had with ROBY and based upon CS-1's personal observations. CS-1 stated CS-1 purchased one-half kilogram of cocaine from ROBY for $12,000 in July 2023 and saw ROBY with a full kilogram of cocaine in this same month.

12. CS-1 has been providing information since August of 2023. The information CS-1 has provided is against CS-1's penal interest. The information provided by CS-1 is consistent with evidence obtained elsewhere in this investigation where CS-1 was not used, and much of CS-1's information has been corroborated through independent investigation, including law enforcement records toll records, and other confidential sources. CS-1 is cooperating for consideration relating to state charges for drug trafficking and possession of a firearm by a felon. CS-1 has been convicted of multiple felonies, to include multiple felonies for narcotics trafficking and firearms. Finally, CS-1 has had an adequate opportunity to directly observe the events discussed and/or has heard conversations directly from the individuals discussed herein. Within the context of the information detailed and relied upon for purposes of this affidavit, case agents believe CS-1 is credible and CS-1's information reliable.

13. CS-1 stated that ROBY is supplied cocaine from two brothers who own/operate "Bar 1000" located on Teutonia Avenue near Capitol Drive. CS-1 described the bar as newly remodeled and renamed. Case agents located a picture of "Bar 1000" located at 3941 N. Teutonia Avenue, and CS-1 confirmed this was indeed the bar from where ROBY obtains cocaine. Case agents later identified Myron BEA (DOB:

5

xx/xx/1977) and Timothy BEA (DOB: xx/xx/1984) as the brothers who operate "Bar 1000." CS-1 stated that, based upon conversations between CS-1 and ROBY, ROBY is charged $19,000 for one kilogram of cocaine from the BEA brothers at Bar 1000.

14. In November 2023, a source of information, hereinafter referred to as SOI-1, provided information on Dandre COLEMAN (DOB: xx/xx/1982) and Bar 1000. Case agents know that COLEMAN is a close associate of Timothy BEA from Bellwood, Illinois. SOI-1 identified COLEMAN as their source of supply for cocaine. SOI-1 stated SOI-1 met COLEMAN in prison and began purchasing cocaine from COLEMAN after communicating over Facebook messenger in the early months of 2022. During this time, SOI-1 and COLEMAN coordinated a deal for a kilogram of cocaine for approximately $24,000. COLEMAN directed SOI-1 to a bar that SOI-1 identified as Bar 1000. SOI-1 described Bar 1000 as being near Capitol and Melvina in the City of Milwaukee. Case agents know this is the general area of where Bar 1000 is located. SOI-1 stated that Bar 1000 was under a remodel at this time. Case agents know that Bar 1000, formerly named "Gee Gee's," went through a full remodel before re-opening in approximately May of 2023, corroborating the information provided by SOI-1.

15. SOI-1 stated that SOI-1 was instructed to meet COLEMAN in the back of Bar 1000 in the alleyway. SOI-1 was escorted into Bar 1000 by COLEMAN and brought to the second-floor area, which SOI-1 described as a living quarters. SOI-1 was introduced to the owner of Bar 1000. SOI-1 could not remember the bar owner's name but informed case agents that SOI-1 would recognize the bar owner if SOI-1 saw him. SOI-1 received the kilogram of cocaine and stated the cocaine was good quality.

6

16.     SOI-1 stated from that point on COLEMAN contacted SOI-1 if COLEMAN had a good price on cocaine. Following the first transaction with COLEMAN, SOI-1 stated that SOI-1 started obtaining 4 to 6 kilograms of cocaine per transaction for approximately $22,000 per kilogram. SOI-1 stated the next 3 or 4 transactions between SOI-1 and COLEMAN happened at Bar 1000 in the same manner as previously described. SOI-1 stated this changed around the summer of 2022. SOI-1 stated that SOI-1 believed there was some type of disagreement between the bar owner (who case agents believe to be Timothy BEA) and COLEMAN about the amount of money each would profit from narcotics deals. COLEMAN began having SOI-1 meet him at a hotel in downtown Milwaukee to conduct their narcotics deals. SOI-1 explained that COLEMAN, or one of COLEMAN's associates, would get a hotel room and tell SOI-1 what room it was.

17.     SOI-1 stated that SOI-1 always paid for the kilograms of cocaine up front and was never "fronted" with the cocaine. SOI-1 stated SOI-1 received a better price on the cocaine by always paying up front. SOI-1 stated the last time SOI-1 dealt with COLEMAN was before SOI-1's arrest in April 2023 when SOI-1 purchased 10 kilograms of cocaine for $19,700 per kilogram. SOI-1 estimated, in total, since the early months of 2022 through April of 2023, SOI-1 received 45-55 kilograms of cocaine through COLEMAN. SOI-1 further explained that SOI-1 believed that COLEMAN was "coat tailing" the owner of Bar 1000 for the narcotics. Because COLEMAN made statements referring to "my brother's bar," SOI-1 believed that COLEMAN was ultimately middling the deals between SOI-1 and the Bar 1000 owner. Additionally, SOI-1 explained on one occurrence, when SOI-1 and COLEMAN were on the phone discussing prices, SOI-1

7

overheard COLEMAN talking to someone else and asking permission to sell drugs for a certain price. SOI-1 stated SOI-1 assumed it was the owner of Bar 1000 from whom COLEMAN would "get permission."

18.　　SOI-1 stated COLEMAN and the owner of Bar 1000 sell both cocaine and fentanyl and had just as much fentanyl as cocaine. SOI-1 stated COLEMAN and the Bar 1000 owner sold kilograms of fentanyl for approximately $45,000. SOI-1 stated SOI-1 received a few ounces of fentanyl from COLEMAN in the past; however, SOI-1 never purchased more because SOI-1 preferred to sell cocaine.

19.　　In February 2024, case agents met with SOI-1 who further detailed SOI-1's dealings with COLEMAN and Bar 1000. The SOI-1 informed case agents that SOI-1 remembered the name of the Bar 1000 owner as "Tim." Case agents showed SOI-1 a photo of Timothy BEA, and SOI-1 believed it to be Timothy BEA. SOI-1 referenced a photo that was located on Dandre COLEMAN's Facebook account, which photo depicted BEA and COLEMAN among others. SOI-1 stated that in this photo BEA is wearing a red hoodie, standing in the back, wearing a hat. Case agents later received the referenced Facebook photo and in this photo case agents identified Timothy BEA as the subject wearing the red hoodie, standing in the back, wearing a hat.

20.　　Case agents asked SOI-1 about the first time SOI-1 met Timothy BEA, and SOI-1 stated it was the first time SOI-1 conducted a narcotics deal at Bar 1000.  SOI-1 stated SOI-1's first conversation with Timothy BEA was more about Timothy BEA "feeling out" SOI-1 to ensure SOI-1 could be trusted. SOI-1 further described the dynamic between COLEMAN and BEA, describing BEA as more of a "co-signer" as it pertained to SOI-1 doing narcotics deals with COLEMAN. SOI-1 described it as BEA

8

being the final approver of the dealings, and that COLEMAN needed BEA's approval as BEA was at the top of the hierarchy. Ultimately, based on the interactions, there was no doubt in SOI-1's mind that Timothy BEA was the person in charge and COLEMAN was a worker of BEA's who benefitted with a cut of the narcotics proceeds from bringing SOI-1 in as a customer. SOI-1 explained that SOI-1 knew the narcotics came from the Chicago-land area, based upon conversations SOI-1 had with COLEMAN and SOI-1's knowledge that BEA and COLEMAN are childhood friends from the Chicago-land area.

21.     SOI-1 has been providing information since November of 2023. The information SOI-1 has provided is against SOI-1's penal interest. The information provided by SOI-1 is consistent with evidence obtained elsewhere in this investigation where SOI-1 was not used, and much of SOI-1's information has been corroborated through independent investigation, including law enforcement records, toll records, and other confidential sources. SOI-1 is cooperating for consideration relating to state charges for Conspiracy to Commit Manufacture/Deliver Cocaine. SOI-1 has been convicted of multiple felonies, to include multiple felonies for narcotics trafficking and firearms. Finally, SOI-1 has had an adequate opportunity to directly observe the events discussed and/or has heard conversations directly from the individuals discussed herein. Within the context of the information detailed and relied upon for purposes of this affidavit, case agents believe SOI-1 is credible and SOI-1's information reliable.

22.     On July 20, 2023, COLEMAN was charged in Kenosha County Circuit Court with Possession with Intent – Cocaine (>40g) and Obstructing an Officer. *See State of Wisconsin v. Dandre R. Coleman*, Kenosha County Case Number 2023CF001102. This case remains pending.

9

## Bar 1000 Operations and Surveillance

23.     During surveillance operations between approximately mid-September up to the present time, case agents have observed Timothy BEA on very regular basis at Bar 1000. Case agents located a Facebook page for Timothy BEA (https://www.facebook.com/tim.bea.96).  On this Facebook page, Timothy BEA lists that he lives in Milwaukee, Wisconsin and is from Bellwood, Illinois. Additionally, Timothy BEA has multiple posts marketing Bar 1000, further showing his involvement/ownership of the Bar.  Through surveillance of Bar 1000, case agents observed that the bar has multiple exterior surveillance cameras covering every side the bar. Based on training and experience case agents know that surveillance cameras are often used by narcotics dealers to conduct counter surveillance on any law enforcement activity and to prevent robberies by rival narcotic dealers.

24.     Based on physical and electronic surveillance, phone record data, and court-authorized location data, case agents believe that Timothy BEA continues to engage in narcotics trafficking and that he uses Bar 1000 to facilitate the DTO. Furthermore, the evidence also leads case agents to believe that other DTO members, to include Hammad ISA (xx/xx/1995) and Foad ISA (xx/xx/1965), meet Timothy BEA at Bar 1000 to further their narcotics trafficking, as more specifically detailed below.

25.     On September 19, 2023, at approximately 3:50 p.m., electronic surveillance at Bar 1000 depicted a gold Cadillac bearing Wisconsin registration ABU-1610 listing to Crystal L ROBINSON (xx/xx/1983), the suspected girlfriend of Timothy BEA, pull into a parking stall in the back of Bar 1000. Timothy BEA exited the driver's seat of the vehicle and walked to the side of Bar 1000, out of view of investigators. At approximately 3:51

10

p.m., Timothy BEA walked to the back gate of Bar 1000, opened the back gate door leading to the bar, and walked inside the patio area of the bar. Seconds later, BEA walked back out to the gold Cadillac, appeared to grab something from the vehicle, and proceeded back to the bar through the gate. The parking slab associated with the back of Bar 1000 abuts a wooden fence, which surrounds an outdoor patio area. The wooden fence has a gated door that contains a locking mechanism. Access to the interior of Bar 1000 can be made through the back patio gate door to the back entry interior doorway.

26. At approximately 3:52 p.m., a gray Lexus RC350 bearing Illinois registration Q198950 listing to Foad ISA at 8509 S. Natoma Burbank, Illinois, pulled into a parking stall next to the gold Cadillac. A younger aged male, wearing a blue long sleeve shirt and blue jeans, later identified as Hammad ISA, exited the vehicle and entered the back gate door of Bar 1000. Hammad ISA has been identified as the son of Foad ISA. At approximately 3:58 p.m., ISA came back out to the gray Lexus and got into the driver's seat of the vehicle.

27. At approximately 4:02 p.m., Timothy BEA exited the back gate door of Bar 1000 carrying a red paper bag and walked to the side of Bar 1000, out of investigators' view. Approximately one minute later, Timothy BEA walked to the back area of the bar, no longer carrying the red bag, however now carrying a blue duffle-style bag. Timothy BEA proceeded to walk back through the back gate door carrying the blue duffle-style bag. Immediately after Timothy BEA walked into the back of Bar 1000, ISA exited the gray Lexus and followed BEA into the bar.

28. At approximately 4:40 p.m., ISA came out from the back gate door of Bar 1000 carrying a large blue box with two hands. The box appeared heavy and appeared

11

to contain contents inside. ISA walked to the front area of his gray Lexus and opened the hood of the vehicle, while Timothy BEA peered his head outside of the back gate door and looked around. Timothy BEA closed the back gate door while ISA was still at the front of the vehicle with the hood open. Approximately one minute later, ISA closed the hood of the vehicle and proceeded to walk to the driver's door carrying the blue box (that now appeared to be empty) with one hand. ISA sat down in the vehicle and before closing his car door, he threw the blue box away in front of his vehicle with one hand, further leading agents to believe that the box no longer contained any contents. ISA proceeded to back out and drive the vehicle away. At approximately 4:47 p.m., BEA exited the back gate door and got into the gold Cadillac before driving away.

29. Case agents observed Hammad ISA had been an identified target in multiple DEA investigations as a money courier/money launderer. In April 2021, ISA was identified in an undercover agent money pick-up investigation. ISA was identified as the money courier who dropped a large amount of United States currency to an undercover agent. During this incident, ISA was driving a gold-colored 2-door Lexus bearing IL registration Q198950 (same vehicle and registration ISA was observed operating at Bar 1000). Additionally, ISA was identified in a HSI money pick-up investigation. In April 2021, a HSI undercover agent was in contact with a Mexican money broker regarding a money contract. The undercover agent met with Hammad ISA who provided the U.S. currency to the undercover agent. In this incident, Hammad ISA was observed driving the same 2-door Lexus bearing IL registration Q198950.

30. Based on Hammad ISA's money laundering activities, Timothy BEA's known large-scale narcotics distribution, and the previous detailed events at Bar 1000,

12

case agents believe that Hammad ISA picked up drug proceeds at Bar 1000 on September 19, 2023. Case agents confirmed the model of Lexus (RC350) does indeed have an engine block in the front of the vehicle underneath the hood. The engine block area of this specific model of vehicle obtains natural voids that items such as currency or narcotics could be stored in. Additionally, based on case agents' training and experience, narcotic traffickers will often have "traps" located in areas of a vehicle to avoid law enforcement detection. A "trap" is a term that describes a hidden area or compartment to place narcotics and/or currency to conceal said illegal items from being located. Based on their training, experience, and familiarity with this investigation, case agents believe that ISA is using the engine block of his vehicle as a trap.

31. On October 17, 2023, at approximately 2:46 p.m., electronic surveillance at Bar 1000 reflected that Timothy BEA arrived in a silver Jaguar XJ8 with WI registration AUW-1498. Timothy BEA parked in the back of the bar, exited the vehicle, and entered into the back gate of Bar 1000. At approximately 3:45 p.m. a subject wearing a white coat walked to the rear of the bar from the front. This subject was later identified as Hammad ISA. Hammad ISA was observed placing a cell phone up to his ear. Case agents reviewed pen register data for Timothy BEA's phone number of 414-552-2844. According to the pen register data, Timothy BEA received a phone call from the **TT-1** at 3:45 p.m. One minute after ISA called Timothy BEA, Timothy BEA exited the rear of the bar and subsequently went back into the bar with Hammad ISA following behind. When ISA walked into the bar he was carrying a white bag in his left hand. Once ISA and BEA entered the back area of the bar, they closed the gate behind them. At approximately 3:49 p.m., BEA and an unknown male black subject exited the rear of the bar. Timothy

13

BEA was carrying a blue and tan colored bag, and the second unidentified subject was carrying a white box. Both subjects walked out of view of case agents. Shortly thereafter, Timothy BEA returned to the bar still carrying the blue and tan bag, while the unknown male black returned to the bar no longer carrying the box. At approximately 3:58 p.m., ISA and Timothy BEA exited the back of Bar 1000. Hammad ISA was observed carrying a brown box in both of his hands (similar to the box he was observed previously carrying on September 19, 2023, as described above). Hammad ISA walked around the north side of the bar, toward the front, and exited the view of case agents. At approximately 4:37 p.m., BEA exited the bar, entered into the silver Jaguar, and left.

32. On October 25, 2023, at approximately 3:21 p.m., electronic surveillance at Bar 1000 reflected that Timothy BEA arrived in the silver Jaguar, parked in the back of the bar, exited the vehicle, and entered into the back gate of Bar 1000. At approximately 3:41 p.m., Hammad ISA was observed walking back and forth near the gate of Bar 1000 with his cell phone in hand for two minutes. At 3:43 p.m., Timothy BEA opened the back gate to Bar 1000 and let ISA in. At approximately 3:47 p.m., Hammad ISA was observed exiting the back gate of the bar and walking southbound in the alleyway, out of view of case agents. Timothy BEA was observed exiting the back gate of Bar 1000 approximately one minute later carrying a black garbage bag that appeared half full. Timothy BEA walked southbound through the alleyway in the same direction of ISA. At 3:50 p.m., Timothy BEA was observed returning to the back gate of the bar with nothing in his hands. ISA then returned to the bar with nothing in his hands at approximately 4:03 p.m. At approximately 4:06 p.m., Hammad ISA's gray Lexus that case agents had seen on previous days left northbound through the alley behind Bar 1000.

14

33.     On October 27, 2023, at approximately 5:57 p.m., electronic surveillance reflected that Timothy BEA arrived in the silver Jaguar XJ8, parked in the back of the bar, exited the vehicle, and subsequently entered into the back gate of Bar 1000. At approximately 6:09 p.m., Hammad ISA's gray Lexus bearing IL registration Q198950 parked behind Bar 1000. ISA parked his vehicle with the front of the vehicle positioned near the back gate of Bar 1000. ISA exited the driver seat of the vehicle and approached the back gate of Bar 1000. Timothy BEA opened the gate for ISA and let him into the bar.

34.     At approximately 6:11 p.m., Johnnie HAYNES (DOB: xx/xx/1970) arrived in his Maroon Dodge Ram pickup truck bearing Wisconsin registration TY6749 and parked in the rear of Bar 1000. Through investigation, HAYNES has been identified as an associate to Myron and Timothy BEA. HAYNES exited his vehicle and walked into the back of the bar. Shortly afterwards, Hammad ISA exited the bar and approached the back of the Lexus. ISA opened the trunk of the Lexus and reached in. ISA closed the trunk and approached the front passenger door of the Lexus. ISA opened the front passenger door, reached in, and then closed the door. ISA walked around to the driver door, reached in and proceeded to walk to the front of the Lexus. ISA stood between the hood of his vehicle and the back gate of Bar 1000, looking around the area in a suspicious manner. As ISA stood near the gate of the bar and scanned the area, the back gate of the bar opened. ISA stepped close to the back gate of the bar and was handed a black bag by someone wearing a black sweatshirt similar to the one Timothy BEA was wearing when he entered the bar. With the bag in hand, ISA quickly turned around and opened the hood of his vehicle. ISA was observed retrieving approximately five rectangular-shaped items wrapped in a shiny film and placed them into the black bag. These items

15

were consistent in shape and size with that of a kilogram of narcotics. After filling the bag, ISA closed the hood of the car and quickly entered the back gate of Bar 1000. At almost the same time ISA entered the back gate with the black bag, HAYNES exited the back gate of the bar and left in his pickup truck.

35. At approximately 6:14 p.m., Timothy BEA exited the back gate of the bar with a black bag in his hand and approached the area where his vehicle was parked. BEA parked his vehicle in an area that was partially blocked from case agents' view. Timothy BEA returned from the area of his vehicle and went back into the bar with nothing in his hands. At approximately 6:20 p.m., a gold Cadillac SUV bearing Wisconsin registration ABU-1610 pulled into the alleyway behind Bar 1000 and parked. Case agents have observed Timothy BEA operating this same vehicle in the past. Timothy BEA exited the bar, walked in the direction of his Jaguar, which case agents could not observe. Shortly afterwards, Timothy BEA walked from the area of his Jaguar to the gold Cadillac SUV. Timothy BEA briefly met with the operator of the vehicle before returning to the bar. The gold Cadillac left immediately after meeting with BEA. At approximately 6:32 p.m., BEA exited the bar again and again met with the operator of the gold Cadillac, which returned to the bar. After a quick exchange between Timothy BEA and the driver of the gold Cadillac, Timothy BEA went back into the bar again. At approximately 6:40 p.m., ISA exited the bar and again opened the hood of his vehicle. ISA was observed either removing something from under the hood, or placing something in the engine block area, before closing it and getting into his vehicle. ISA left the area immediately after getting into his vehicle.

16

36.     As stated previously, placing items in trap areas, like an engine block underneath the hood of a vehicle, is consistent with hiding illegal substances or drug proceeds. Additionally, based on their training and experience, case agents know that drug traffickers often scan the area around them when engaging in illegal activity in counter-surveillance efforts, or to detect the presence of any onlookers, including law enforcement officers and rival drug traffickers. Against the backdrop of Timothy BEA and Hammad ISA's known narcotics distribution activities, their counter-surveillance described above and the transfer of items located in the engine block of a vehicle is activity that is consistent with narcotics distribution.

### Monitoring of TT-1

37.     AT&T records reflect that **TT-1** lists a Financial Liable Party and Billing Party of Hammad ISA with the address of 8509 Natoma Avenue, Burbank, Illinois, and a service start date of March 9, 2021.

38.     On November 3, 2023, the Honorable William E. Duffin, U.S. Magistrate Judge, Eastern District of Wisconsin, signed and authorized a E-911/GPS ping warrant for ISA's known cell phone number, **708-986-7822** (**TT-1**). *See* 23 MJ 176. Multiple extensions of this warrant were authorized.

39.     On November 3, 2023, an E-911/GPS ping for **TT-1** indicated that **TT-1** was located in the general area of Santa Fe, New Mexico. Beginning during the evening of November 3, 2023, and continuing into November 4 and 5, **TT-1** reflected it was traveling back to the Chicago-land area. On the morning of November 5, 2023, **TT-1** was located back in the Burbank, Illinois area, where it is believed ISA resides.

40. Case agents reviewed the pen data generated on November 3, 2023, from the **TT-1** and observed ISA to be in contact with multiple New Mexico-based phone numbers. Case agents observed ISA was in contact with the phone number (505) 842-0762, which is associated to the U-Haul of Westside, 2201 6th Street NW, Albuquerque, New Mexico. Results from an administrative subpoena issued to the U-Haul International Legal Department reflect ISA rented a 15' moving van from the above stated U-Haul. The rental contract displayed the customer information of Hammad ISA with the address of 8509 Natoma Avenue, Burbank, Illinois, with the primary phone number of **(708) 986-7822** (**TT-1**) and email of isahammadmri@gmail.com. The reservation was made on November 3, 2023 at 10:38 a.m. with a due back date of November 4, 2023. Within the contract was a scanned copy of ISA's Illinois Driver's License and the additional contacts of Joanna LOJEK (ISA's suspected girlfriend) and Waseen GHOULEH. The notes section of the contract reflects that U-Haul attempted to contact ISA on November 4, 2023 (the due back date of the rental) and received no answer. On November 5, 2023, ISA requested the rental to be returned to the Chicago or Burbank, Illinois area and was advised that the rate would double to $3,150, to which ISA agreed. The rental truck was returned to U-Haul Moving & Storage of Oak Lawn, 8900 S. Cicero Avenue, Oak Lawn, Illinois, on November 6, 2023 at 6:32 a.m. Based on their training and experience, case agents know that large-scale narcotic traffickers will often use rental cars or trucks when transporting bulk amounts of narcotics long distances to deter law enforcement detection. Based on case agents' training and belief, ISA's not disclosing to U-Haul his trip end location (Chicago-land area) during the rental process shows an overt action to conceal his movements while using the U-Haul rental.

18

41. On November 7, 2023, case agents received information from HSI that Hammad ISA had a scheduled flight for November 10, 2023, from O'Hare International Airport in Chicago, Illinois (ORD), to Puerto Vallarta, Mexico. On November 10, 2023, at approximately 7:48 a.m., **TT-1's** E-911/GPS pings reflected it was in the area of ORD. However, ISA returned to the Burbank, Illinois area for the rest of the day. Case agents received information from HSI that ISA re-booked his flight to Puerto Vallarta, Mexico for November 11, 2023, and did not book a return flight.

42. On November 11, 2023, at approximately 6:58 a.m., case agents observed **TT-1's** E-911/GPS ping indicated to be in the area of ORD. At approximately 8:44 a.m., case agents stopped receiving E-911/GPS ping data, indicating ISA was in the airplane without service. On November 13, 2023, case agents received information from HSI that ISA was scheduled to return from Mexico to ORD on November 14, 2023. Upon ISA's return, he was observed alone and was stopped and questioned by U.S. Customs agents. ISA stated he stayed at the Marriot Puerto Vallarta Resort & Spa and that he was at a friend's wedding. ISA stated he owns a business called Al Aqsa Supermarket located at 8515 S. Harlem Avenue, Burbank, Illinois, and that he owned the business for the past year and a half after taking over for his uncle. ISA provided his address of 8509 S. Natoma Avenue, Burbank, Illinois, and provided his number as **(708) 986-7822** (**TT-1**). ISA was released without incident.

43. During ISA's trip to Mexico, phone records reflect that on November 12, 2023, **TT-1** had a 41-second incoming phone call from the Mexican phone number 52-6624274721 using the WhatsApp platform. Following the phone call, **TT-1** received two incoming messages from the same Mexican phone number. Additionally, case agents

19

observed ISA was in frequent contact with his father, Foad ISA, (**TT-2**), and multiple Oakland, California-based phone numbers during this trip.

44. The court-authorized location data for **TT-1** reflected that ISA's phone traveled to the Milwaukee area on November 10, November 15, November 22, November 30, and December 11, 2023. On each occasion, ISA's phone remained in Milwaukee, near the area of Bar 1000, for only a short duration of time before returning to the area of Burbank, Illinois where he resides. The total trip duration for each trip was approximately three hours or less.

45. On the dates that ISA's phone was located in Milwaukee, case agents reviewed electronic surveillance or conducted physical surveillance at Bar 1000 and observed Hammad ISA at Bar 1000 on four occasions and Foad ISA at the bar on two occasions, as detailed below.

    a. On November 9 and 22, 2023, Hammad ISA was not observed on electronic surveillance at Bar 1000. However, on November 9, 2023, white en route to Milwaukee, Hammad ISA, using **TT-1**, called Timothy BEA's secondary phone (414-552-2844). Approximately 3 minutes after calling Timothy BEA, Hammad ISA received a call from Foad ISA, using **TT-2**. Nine minutes later, Hammad ISA called Timothy BEA. Hammad ISA then called Foad ISA once again a few minutes later. The location data for **TT-1** reflected that it was in the area of Bar 1000 for approximately fifteen minutes on November 9, and that it was in Milwaukee for approximately 45 minutes on November 22, 2023.

    b. On November 15, 2023, at approximately 5:08 p.m., case agents observed via electronic surveillance what appeared to be a black Ford Edge pull into the back parking stall of Bar 1000. Individuals believed to be Foad ISA and Hammad ISA exited the Ford Edge and entered Bar 1000. Hammad ISA then exited the bar, walked to the front driver's side of the Ford Edge, appeared to grab something, and re-entered Bar 1000. At approximately 5:22 p.m., Foad and Hammad ISA exited Bar 1000 and departed the area in the Ford Edge. Furthermore, case agents observed Timothy BEA arrived to Bar 1000 at approximately 1:00 p.m. on this day

20

and remain at the bar long after the ISA's left. Based on **TT-1's** location data, **TT-1** was in Milwaukee for approximately 45 minutes on this day.

c. On November 30, 2023, case agents observed via electronic surveillance Timothy BEA's black Cadillac Escalade pull up in the back of Bar 1000. Following directly behind the Cadillac Escalade was a black Ford Edge bearing IL registration EA93867 (suspected to be Foad ISA's vehicle). Hammad ISA and an individual believed to be Foad ISA exited the black Ford Edge. At approximately 5:00 p.m., Foad ISA opened the driver door of the Escalade and appeared to briefly manipulate something within the vehicle while Hammad ISA opened the front passenger door. Both subjects closed the doors to the Escalade, appeared to talk with an individual within the gated area, and subsequently walked through the side walkway of the bar, which is located between Bar 1000 and an apartment complex located at 3947 N. Teutonia (an apartment associated with Timothy BEA and other identified DTO members). It was unclear if either Foad or Hammad ISA were carrying anything. Shortly thereafter, Timothy BEA arrived in the back of the bar in his known silver Jaguar XJ8 bearing WI plate AUW-1498 and entered the bar through the back gate. At approximately 5:31 p.m., an unknown subject exited the back gate of Bar 1000 and entered the 3947 N. Teutonia Avenue apartment complex for approximately one minute before returning to Bar 1000. At approximately 5:35 p.m., Hammad and Foad ISA exited the back gate of Bar 1000 and left in the black Ford Edge.

d. On December 11, 2023, at approximately 2:55 p.m., case agents conducted physical surveillance and observed Hammad ISA's known silver Lexus bearing IL plate Q198950 and Timothy BEA's silver Jaguar parked in the back of Bar 1000. At approximately 3:09 p.m., after being at Bar 1000 for approximately 16 minutes, agents observed Hammad ISA walk to his Lexus and leave the bar.

e. On December 27, 2023, case agents monitored **TT-1** and observed at approximately 4:16 p.m., **TT-1** indicated to be in the area of Bar 1000. Case agents reviewed electronic surveillance and at approximately 4:08 p.m., Timothy BEA exited the back gate of the bar and walked to the end of a privacy fence that partially encloses the parking in the rear of Bar 1000. Timothy BEA appeared to look around the fence and speak with someone. Several minutes later, Hammad ISA was observed walking around the privacy fence carrying a white bag that appeared to be heavy. Hammad ISA entered into Bar 1000 using the rear gate. At approximately 4:45 p.m., Hammad ISA is observed on electronic surveillance exiting the back gate of Bar 1000, carrying the same white bag. Hammad ISA then walked out of view of the electronic surveillance.

21

46. Based on their training, experience, and familiarity with this investigation, case agents believe that Hammad and Foad ISA's shorter duration trips to meet with Timothy BEA at Bar 1000 are consistent with narcotics-related activities.

47. Until March 9, 2024, case agents have not observed either Foad or Hammad ISA at Bar 1000. On March 9, 2024, at approximately 5:04 p.m., electronic surveillance reflected that a black 2024 Ford Edge Select bearing Illinois registration EA93867, listing to Foad ISA, arrived and parked in the rear of Bar 1000. Foad ISA exited the passenger seat of the vehicle, and Hammad ISA exited the driver's side of the vehicle. The ISAs approached the bar, knocked on the back gate of Bar 1000, and stood outside for approximately one minute. After they received no response at the gate, Hammad ISA sat back in the driver seat of the vehicle, and Foad ISA walked to the front of Bar 1000. At approximately 5:07 p.m., the back gate of Bar 1000 opened and Foad ISA and Timothy BEA exited the bar. Foad ISA approached the front of his Ford Edge and lifted the hood. Timothy BEA then walked to the front of the Ford Edge at which time it appeared that Foad ISA handed something to Timothy BEA. BEA quickly turned around and returned to the inside of Bar 1000. Foad ISA closed the hood of the car and followed BEA into the bar. Simultaneously, Hammad ISA exited the driver seat of the vehicle and followed BEA and Foad ISA into the bar. Once all three subjects were inside of Bar 1000 they closed the gate behind them.

48. At approximately 5:15 p.m., Foad ISA exited the back gate of Bar 1000 carrying an object in his left hand. Hammad ISA exited the back gate of Bar 1000 immediately after Foad ISA and walked to the driver door of Foad ISA's vehicle. Foad

22

ISA walked to the hood of the vehicle and waited. Hammad ISA opened the driver door of the vehicle, reached in, and hit the vehicle's hood release. Foad ISA then lifted the hood of the vehicle, placed the object he was carrying under the hood of the vehicle, closed the hood, and got into the passenger seat. At approximately 5:16 p.m., the ISAs left the area.

**Toll Analysis**

49.    Case agents reviewed all call/message data received from **TT-1** from August 1, 2023 through March 10, 2024. Hammad ISA's second most frequented contact is his father, Foad ISA, who uses **TT-2**. **TT-1** was only in contact with one Wisconsin-based phone number, 414-552-2844, which is the known phone number of Timothy BEA. There have been a total of 28 contacts between **TT-1** and BEA from August 19, 2023 through January 18, 2024. Additionally, case agents observed **TT-1** had 79 contacts with the Mexican based phone number 52-6624274721 (same number Hammad ISA had contact with during his trip to Mexico) from September 2, 2023 through March 4, 2024. Additionally, case agents observed **TT-1** had multiple contacts with Jordanian-based phone numbers, an Egypt-based phone number, a China-based phone number, and 7 total Mexican-based phone numbers (including 52-6624274721).

50.    **TT-2**'s subscriber is listed as unknown; however, **TT-2** is associated with Foad ISA in law enforcement databases. Case agents reviewed all call/message data received from **TT-2** from September 29, 2023 through March 10, 2024. **TT-2** was only in contact with one Wisconsin-based phone number, 414-552-2844, which is the known phone number of Timothy BEA. There have been a total of 4 contacts between **TT-2** and BEA from January 30, 2024 through February 1, 2024. Case agents observed **TT-2** had 50

23

contacts with the Mexican based phone number 52-6624274721 (same number in contact with Hammad ISA) from October 8, 2024 through March 10, 2024. Additionally, case agents observed **TT-2** had multiple contacts with Israel-based phone numbers, an Afghanistan-based phone number, a State of Palestine-based phone number, and a Turkey-based phone number.

51.     Through law enforcement databases, case agents located a WhatsApp account photo associated to Mexican-based phone number 52-6624274721. Using the Homeland Security Office of Biometric Identity Management, case agents submitted the WhatsApp photograph to the database and received a "highly likely match." The match listed the subject, Marcelino ARREDONDO-SANCHEZ (xx/xx/1963). Past DEA investigations reflect that ARREDONDO-SANCHEZ has been identified as a person involved in drug trafficking activities, along with a member of the ISA family. On May 9, 2014, ARREDONDO-SANCHEZ was indicted in the District Court for the Central District of California with eleven co-defendants, one of which was Nabhan ISA, the brother of Foad ISA. *See United States v. Marcelino Arredondo-Sanchez et al.*, Case No. CR 14 00267. ARREDONDO-SANCHEZ was charged in a drug conspiracy with the distribution and possession with intent to distribute cocaine and methamphetamine, among other drug-related felony charges. The Indictment alleged that ARREDONDO-SANCHEZ arranged for the shipment of large quantities of methamphetamine and cocaine from his suppliers in Mexico and would resell those drugs to brokers in Southern California and in and around Chicago, Illinois. Nabhan ISA was alleged to have sold large quantities of pseudoephedrine/ephedrine to ARREDONDO-SANCHEZ and other co-conspirators for use in the large-scale production of methamphetamine. Nabhan ISA

24

was also alleged to have purchased cocaine and marijuana from ARREDONDO-SANCHEZ to resell in Chicago and other markets. *Id.* ARREDONDO-SANCHEZ is currently a fugitive and has been in wanted status since 2014. Based on the past connection to members of the ISA family, the "highly likely match" of the WhatsApp photo, and ARREDONDO-SANCHEZ's known large-scale drug trafficking activities for the Sinaloa Cartel, case agents believe the contacts between 52-6624274721, **TT-1** and **TT-2** are narcotics related and that ARREDONDO-SANCHEZ is a source of narcotics supply for the ISA DTO.

### CONCLUSION

52. Evidence obtained during this investigation leads case agents to believe that Hammad ISA operates **TT-1** and Foad ISA operates **TT-2**. The location data associated with **TT-1** and **TT-2** will assist case agents in conducting targeted physical surveillance and further identify the locations and individuals associated with and the nature and scope of ISA's drug trafficking activities.

53. Case agents searched law enforcement databases to confirm that **TT-1** is currently being serviced by AT&T and **TT-2** is currently being serviced by T-Mobile.

54. Case agents are requesting this warrant authorizing the initial collection of data related to **TT-1** and **TT-2** for 30 days to further investigate the ISA's activities, and to identify locations to which the ISA's are traveling to further his drug distribution trafficking activities.

55. Based upon my training and experience, I know that individuals involved in drug trafficking use their cellular telephones to contact other drug dealers and drug purchasers, and that information relating to their telephones may show the areas in

25

which they are trafficking drugs and the individuals who they are contacting to sell or distribute the drugs. Based upon the facts in this affidavit, there is probable cause to believe that Hammad and Foad ISA are engaged in the trafficking and distribution of controlled substances and are using the **TT-1** and **TT-2** while engaged in these crimes. I further submit that probable cause exists to believe that obtaining the location information of **TT-1** and **TT-2** will assist case agents in determining Hammad and Foad ISA's criminal activities, to include meeting locations, co-conspirators, and sources of supply.

56.     In my training and experience, I have learned that the Service Provider is a company that provides cellular communications service to the general public. I also know that providers of cellular communications service have technical capabilities that allow them to collect and generate information about the locations of the cellular devices to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular device and, in some cases, the "sector" (i.e., faces of the towers) to which the device connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate general location of the cellular device.

**Cell-Site Data**

57. Based on my training and experience, I know that the Service Provider can collect cell-site data on a prospective basis about **TT-1** and **TT-2**. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as the Service Provider typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

58. I further know that some service providers can collect timing advance or engineering data commonly referred to as per call measurement data (PCMD), RTT, True Call, Advance Timing, WebMap, or equivalent. Per-call measurement data estimates the approximate distance of the cellular device from a cellular tower based upon the speed with which signals travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

**E-911 Phase II / GPS Location Data**

59. I know that some providers of cellular telephone service have technical capabilities that allow them to collect and generate E-911 Phase II data, also known as GPS data or latitude-longitude data. E-911 Phase II data provides relatively precise

27

location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. As discussed above, cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise than E-911 Phase II data. Based on my training and experience, I know that the Service Provider can collect E-911 Phase II data about the location of **TT-1** and **TT-2**, including by initiating a signal to determine the location of **TT-1** and **TT-2** on the Service Provider's network or with such other reference points as may be reasonably available.

60. I know that AT&T Corporation can provide historical precision GPS location information, historical handset location data, and handset triangulation data, also known as Network Event Location System (NELOS) data. NELOS data may provide location data based upon the handset itself. Furthermore, I know that T-Mobile can use its precision location tool with cellular devices, also known as WebMap.

**Subscriber Information**

61. Based on my training and experience, I know that wireless providers such as the Service Provider typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of

28

payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as the Service Provider typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify **TT-1** and **TT-2's** user or users and may assist in the identification of co-conspirators and/or victims.

## AUTHORIZATION REQUEST

62. Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

63. I further request that the Court direct the Service Provider to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.

64. I also request that the Court direct the Service Provider to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of **TT-1** and **TT-2** on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

29

65. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 180 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of **TT-1** and **TT-2** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. See 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. See 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. See 18 U.S.C. § 3103a(b)(2).

66. Because the warrant will be served on the Service Provider, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night. I therefore request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate **TT-1** and **TT-2** outside of daytime hours.

## ATTACHMENT A-1

### Property to Be Searched

1. Records and information associated with the cellular devices assigned the call number (708) 986-7822 (referred to in the Affidavit as "Target Telephone-1 or TT-1" and in Attachment B as the Target Cell Phone), that is in the custody or control of AT&T (referred to herein and in Attachment B as the "Service Provider"), a wireless communications service provider that is headquartered at 11760 U.S. Highway 1, North Palm Beach, Florida.

2. The Target Cell Phone.

1

vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records, and

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Target Cell Phone for the time period February 1, 2023, to the present including:

   a. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

   b. information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received), as well as timing advance or engineering data commonly referred to as per call measurement data (PCMD, RTT, True Call, Advance Timing, Network Event Location Operating System Information (NELOS), WebMap, or equivalent).

b. Information associated with each communication to and from the Target Cell Phone for a period of 30 days from the date of this warrant, including:

   i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

   ii. Source and destination telephone numbers;

   iii. Date, time, and duration of communication; and

   iv. All data about the cell towers (i.e., antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the Target Cell Phone will connect at the beginning and end of each communication, as well as timing advance or engineering data commonly referred to as per call measurement data (PCMD, RTT, True Call, Advance Timing, Network Event Location Operating System Information (NELOS), WebMap, or equivalent).

2

c. Information about the location of the Target Cell Phone for a period of 30 days during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

   i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Service Provider, the Service Provider is required to disclose the Location Information to the government. In addition, the Service Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of the Target Cell Phone on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

   ii. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. See 18 U.S.C. § 3103a(b)(2).

## II.   Information to be Seized by the Government

All information described above in Section I that constitutes evidence of violations of Title 21, United States Code, Sections 841(a)(1) and 846, involving Hammad ISA and Foad ISA and others known and unknown from October 1, 2023, to the present.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider to locate the things particularly described in this Warrant.

3

# CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by AT&T Corporation, and my title is _____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of AT&T Corporation. The attached records consist of _____.

I further state that:

a. All records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of AT&T and they were made AT&T as a regular practice;

and

b. Such records were generated by AT&T Corporation's electronic process or system that produces an accurate result, to wit:

1. The records were copied from electronic device(s), storage medium(s), or file(s) in the custody of AT&T Corporation in a manner to ensure that they are true duplicates of the original records; and

1

2. The process or system is regularly verified by AT&T Corporation and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

| | |
|---|---|
| _____ | _____ |
| Date | Signature |

2